GRIFFIS, P.J.,
 

 for the Court:
 

 ¶ 1. Satyadev Meka sued Grant Plumbing
 
 &
 
 Air Conditioning Company and its employee Albert Grube (collectively, “Grant Plumbing”) for injuries he sustained in an automobile accident. A jury determined that Meka suffered $100,000 in damages, but it assessed Meka with forty-percent comparative fault for the accident. Accordingly, the trial court entered a judgment awarding Meka $60,000 in total damages. Meka filed a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial or an additur of the damages awarded. The trial court denied the motion, and this appeal followed. We find no reversible error and affirm.
 

 FACTS
 

 ¶ 2. On February 17, 2006, shortly before 8:00 a.m., Meka and his daughter, Pam Meka, were driving north in the right-hand lane on Interstate 55 in Meka’s sport utility vehicle, on their way to Mississippi College, where Pam was a student. Traveling in the same lane immediately behind Meka’s SUV was a UtiliQuest truck, driven by Jeffrey Koontz. Following immediately behind the UtiliQuest truck, was Grant Plumbing’s truck, driven by Grube.
 

 ¶ 3. Meka testified at trial that as he approached the Adkins Boulevard exit, he felt some discomfort in his chest area.
 
 [1]
 
 Meka turned on his right-turn signal, slowed the SUV, and pulled the vehicle into the “white-striped triangular area” just past the concrete divider that separates 1-55 and the northbound on-ramp from Adkins Boulevard. According to Meka, he had stopped the SUV almost completely when his SUV was struck from behind by the Grant Plumbing truck. The impact caused Meka’s SUV to roll over on its side and then upside down. Pam removed herself from the vehicle; she and a passerby then helped Meka out of the vehicle — both Meka and Pam were wearing their seat belts • at the time of the
 
 *21
 
 accident. An ambulance arrived at the scene soon afterwards; however, neither Meka nor Pam felt the need to go to the hospital. Meka began feeling soreness in his back later that day after he had gotten home. He said the soreness progressed into severe pain a couple of days later. Meka eventually sought treatment for the pain a couple months after the accident.
 

 ¶ 4. Koontz testified that immediately prior to the accident he was traveling approximately four to five car lengths behind Meka’s SUV at a rate of speed of fifty-five miles per hour.
 
 [2]
 
 Koontz stated that as Meka’s SUV approached the Adkins Boulevard on-ramp, he observed the SUV’s brake lights and its right-turn signal activate. He said the SUV then moved over to the right where the concrete divider ends, and it came to a complete stop in the triangular area between 1-55 and the on-ramp. Koontz told the jury that the rear portion of Meka’s SUV “was sticking out” onto 1-55 (approximately ten percent of the vehicle according to Koontz). According to Koontz, enough of Meka’s SUV obstructed the right lane that he could not stay in that lane and pass the SUV safely. So Koontz slowed the UtiliQuest truck and proceeded over into the left lane. As he did so, the UtiliQuest truck was struck in the rear-passenger side by the Grant Plumbing truck. Koontz said the impact “jolted” him, which caused him to briefly lose full control of the UtiliQuest truck for a short distance. The UtiliQuest truck made no contact with Meka’s SUV.
 

 ¶ 5. Grube testified that he was traveling five or six car lengths behind the Utili-Quest truck at approximately fifty-five to sixty miles per hour. Grube said he remembered seeing the brake lights on the UtiliQuest truck brighten, and the Utili-Quest truck then veered over to the left lane. Grube said it was at that point he first saw Meka’s SUV sitting at an angle in the triangular area to the right, and he said that a portion of the SUV obstructed his lane of travel. Grube estimated that he was approximately three to four car lengths away from Meka’s SUV the moment he realized the SUV had stopped. According to Grube, he slowed the Grant Plumbing truck and tried to maneuver around the UtiliQuest truck, but he hit the back-right corner of the UtiliQuest truck.
 
 [3]
 

 ¶ 6. The record is unclear as to what exactly happened next, but the Grant Plumbing truck ultimately collided with Meka’s SUV. Grube testified that the Grant Plumbing truck was approximately one to two feet over into the triangular section when it hit Meka’s SUV.
 

 ¶ 7. Two experts testified at trial, both on behalf of Meka. Dr. Dinesh Goel, board certified in general surgery and an expert in family medicine, testified both as a medical expert and as Meka’s treating physician. Dr. Glenda Glover, qualified as an expert in economics, testified as an economic-loss expert.
 

 ¶ 8. Dr. Goel testified that he first saw Meka in June 2007, when Meka presented to his medical office with a hurt back. Dr. Goel diagnosed Meka as suffering from two bulging discs in his back, “at the L-5, S — 1 and the L-4, L-5” vertebrae, which were causing Meka severe pain in his left leg and “neuropathy.” Using the American Medical Association guidelines for permanent impairment, Dr. Goel determined that Meka had a ten percent disability rating as a result of his back condition.
 
 *22
 
 Dr. Goel, who disclosed that he does not perform back surgeries and no longer practices general surgery, estimated that the type of surgery needed to repair Meka’s back injury would cost anywhere from $80,000 to $100,000. According to Dr. Goel, Meka likely would require additional medical treatment along with the surgery, which he, Dr. Goel, could administer. He estimated that such treatment could cost approximately $3,000 to $4,000 per year.
 

 ¶9. Dr. Glover testified that based on Meka’s age and qualifications as a computer engineer, Meka’s total loss of earnings — were he never able to work again— would be approximately $1,359,000. Dr. Glover arrived at this figure by taking into account Meka’s age, which was forty-seven at the time of the accident; a progressive salary index beginning at $55,000 per year; and the fact that Meka had approximately twenty years left in the workforce.
 

 ¶ 10. Evidence also was presented to the jury that Meka has not been employed by anyone since the year 2002. In 2007, Meka applied for a job with a company called Quality Matrix, located in New Jersey. That same year, Quality Matrix offered Meka employment with the company as a computer systems analyst, at a salary of $55,000 per year. According to Meka, the reason why he applied for the job at Quality Matrix was in order to test the job market; he did not intend to work for Quality Matrix because he was medically unable to do so due to his back problems.
 

 ¶ 11. The jury returned a verdict in favor of Meka, and it determined that Meka suffered $100,000 in damages as a result of the accident. That amount was diminished by $40,000 based on the jury’s determination that Meka was forty percent at fault for the accident.
 

 ¶ 12. On appeal, Meka argues that he is entitled to a new trial, and he asserts a number of issues in support thereof, which we have narrowed down to four and rephrased to avoid repetition. Meka contends that the trial court erred by: (1) allowing the jury to apportion fault; (2) granting certain jury instructions proposed by Grant Plumbing; (3) refusing his proposed jury instruction that set forth his second theory of liability — Grant Plumbing’s failure to teach Grube safe-driving habits; and (4) allowing testimony regarding Meka’s citizenship status in the United States.
 

 DISCUSSION
 

 ¶ 13. This Court reviews a trial court’s grant or denial of a motion for a new trial for an abuse of discretion.
 
 Gober v. Lee,
 
 8 So.3d 912, 915 (¶ 13) (Miss.Ct.App.2009). The Mississippi Supreme Court has held that “a new trial becomes appropriate when a trial court determines that error within the trial mechanism itself has caused a legally incorrect or unjust verdict to be rendered.”
 
 White v. Stewman,
 
 932 So.2d 27, 33 (¶ 15) (Miss.2006). The supreme court has also held that:
 

 A new trial may be granted in a number of circumstances, such as when the verdict is against the overwhelming weight of the evidence, or when the jury has been confused by faulty jury instructions, or when the jury has departed from its oath and its verdict is a result of bias, passion, and prejudice.
 

 Solanki v. Ervin,
 
 21 So.3d 552, 569 (¶ 46) (Miss.2009) (quoting
 
 Bobby Kitchens, Inc. v. Miss. Ins. Guar. Ass’n,
 
 560 So.2d 129, 132 (Miss.1989)).
 

 I. Apportionment of Fault
 

 ¶ 14. Meka argues that Grant Plumbing failed to present any evidence showing he acted negligently or caused or contributed to his injuries; thus, the jury
 
 *23
 
 should not have been allowed to consider apportioning fault to him. We disagree.
 

 ¶ 15. Mississippi is a pure comparative-negligence state. Miss.Code Ann. § 11-7-15 (Rev.2004).
 
 See also Blackmon v. Payne,
 
 510 So.2d 483, 486 (Miss.1987). “Under the comparative negligence doctrine, negligence is measured in terms of percentage, and any damages allowed shall be diminished in proportion to amount of negligence attributable to the person for whose injury, damage or death recovery is sought.”
 
 Coho Res., Inc. v. Chapman,
 
 913 So.2d 899, 911 (¶ 36) (Miss.2005). ‘Where negligence by both parties is concurrent and contributes to injury, recovery is not barred under such doctrine, but [the] plaintiffs damages are diminished proportionately!.]”
 
 Burton ex rel. Bradford v. Barnett,
 
 615 So.2d 580, 582 (Miss.1993). This holds true “even to the extent that negligence on the part of the plaintiff was ninety percent (90%) and on the part of the defendant was ten percent (10%)”; in such an instance, “the plaintiff [still] would be entitled to recover theoretically that ten percent.”
 
 Id.
 
 Thus, even though the plaintiff was negligent, the plaintiff may recover from a defendant whose negligence contributed to the plaintiffs injury.
 
 Id.
 

 ¶ 16. Grant Plumbing’s theory of the case was that Meka was negligent per se for violating Mississippi Code Annotated section 63-3-903 (Rev.2004), which states, in pertinent part, that:
 

 No person shall stop, park or leave standing any vehicle, whether attended or unattended, upon the paved or improved or main traveled part of any highway outside of a business or residence district when it is practical to stop, park or so leave such vehicle off such part of said highway. In every event, however, a clear and unobstructed width of at least twenty (20) feet of such part of the highway opposite such standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicle be available from a distance of two hundred (200) feet in each direction upon such highway.
 

 Grant Plumbing attempted to demonstrate a violation of section 63-3-903, at trial, by the agreed upon terms contained in the trial court’s pretrial order, which set forth each parties’ theory of the case, and which amended the parties’ respective pleadings, accordingly.
 

 ¶ 17. In
 
 Teche Lines, Inc. v. Danforth,
 
 195 Miss. 226, 12 So.2d 784 (1943), the Mississippi Supreme Court addressed the constitutionality of section 63-3-903’s predecessor, Section 90 of Chapter 200, Laws of 1938. Speaking to the twenty-foot requirement provision,
 
 Danforth
 
 took judicial notice that at least eighty-five percent of Mississippi’s highways at the time were of such a width that a motorist could stop only occasionally without violating the law.
 
 Id.
 
 at 254, 12 So.2d at 788. This result, according to the
 
 Danforth
 
 court, “would be an unreasonable and arbitrary abridgment of the right to travel, thus rendering the statute unconstitutional when so interpreted.”
 
 Id.
 
 To save the statute as written,
 
 Danforth
 
 held that the word “practical” should be given operation throughout the entire section; the court concluded as follows:
 

 Our ruling is that when twenty feet of clearance is impossible, the vehicle shall turn as far to the right as practical including sound and safe shoulders, but must not stop upon any part of the traveled highway unless and until at least 200 feet clear view is available in each direction from the point where the stop is made, save when the vehicle is disabled....
 

 Id.
 
 at 255, 12 So.2d at 788.
 

 ¶ 18. In
 
 Stong v. Freeman Truck Line, Inc.,
 
 456 So.2d 698, 707 n. 7 (Miss.1984),
 
 *24
 
 the supreme court reiterated that section 63-3-903 furnishes the “standard of care of a reasonable man[,]” the deviation of which “constitute[s] negligence per se.”
 
 Stong
 
 was a negligence action arising from a collision on 1-55 between an automobile and a stalled truck, which occurred in the southbound lanes of 1-55, a short distance south from where the accident at issue occurred. The
 
 Stong
 
 court examined the “business or residence district” language contained in the statute, holding that “as a matter of law, a limited-access interstate highway such as 1-55 is not within a business or residence district within the meaning ... of the Uniform Highway Traffic Regulation Law, codified in §§ 63-3-1 et seq.”
 
 Id.
 
 at 704-06. In so holding, the
 
 Stong
 
 court explained:
 

 An interstate expressway that goes through heavily populated municipal areas is designed to speed the flow of traffic and, as much as possible, to simulate the traffic conditions found on all other parts of the interstate system. Motorists reasonably expect that they will encounter no stopped vehicles within regular lanes of travel. Indeed, the system is designed so that the driver will be free from worry about turning, slow moving[,] or stalled automobiles.
 

 Id.
 
 at 705-06.
 

 ¶ 19. In
 
 Stong,
 
 the supreme court said the effect of section 63-3-903 “is to provide that no person shall stop his motor vehicle on ‘the main traveled part’ of the highway ‘when it is practical’ to stop off the highway.”
 
 Id.
 
 at 707 (citations omitted).
 
 Stong
 
 reiterated that the construction of the statute requires consideration of whether under the facts and circumstances of a particular case it is reasonably practical for a driver to pull his or her vehicle off the main traveled part of the highway.
 
 Id.
 
 at 708. “This question is ordinarily one of fact to be submitted to a jury on proper instructions.”
 
 Id.
 

 ¶ 20. Here, the trial court instructed the jury through jury instruction C-ll (originally jury instruction D-13), as follows:
 

 You are instructed that Mississippi law prohibits stopping a vehicle in the paved or main traveled portion of a public highway, whether attended or unattended, when it is practical to stop such vehicle off the paved or main traveled portion of the highway.
 

 If you find that the Plaintiff, Satyadev Meka, stopped his vehicle in a place and manner where it was unreasonably practical for him to stop his vehicle, then Satyadev Meka was negligent.
 

 If you find that Satyadev Meka’s negligence was a proximate contributing cause of the accident and his own injuries, then you shall apportion liability (fault) to Satyadev Meka in accordance with the further instructions of this [cjourt.
 

 If, however, you find that Satyadev Meka’s negligence was the sole proximate cause of the accident and Satyadev Meka’s injuries, then you shall return a verdict in favor of the Defendant, Albert Grube.
 

 ¶ 21. A similar instruction was given in
 
 Solanki,
 
 which read as follows:
 

 The Court instructs the jury that according to Mississippi law no person shall stop, park or leave standing any vehicle, whether attended or unattended, upon the paved or main traveled part of any highway, unless it is impossible to avoid stopping in the roadway.
 

 Therefore, if you find from a preponderance of the evidence in this case that the decedent, Nilima Solanki, allowed her vehicle to stop in a lane of travel on the highway when it was possible or
 
 *25
 
 reasonably practicable for her to steer her vehicle onto the shoulder of the highway, then the Court instructs the jury that such acts constitute negligence on behalf of the decedent, and if you find from a preponderance of the evidence that such negligence was the sole proximate cause of the accident, then it is your sworn duty to return a verdict for Melvin Ervin and The Merchants Company.
 

 If you find that such negligence of the decedent Nilima Solanki was a proximate contributing cause of the accident and that the negligence of Melvin Ervin was also a proximate contributing cause of the accident, then it is your sworn duty to decide the amount you would have awarded for her death, if any, and then reduce that amount by the percentage of Nilima Solanki’s negligence.
 

 Solanki,
 
 21 So.3d at 561-62 (¶ 22).
 

 ¶ 22. The
 
 Solanki
 
 court found that the trial court properly granted this instruction because it correctly stated the law and was warranted by the evidence.
 
 Id.
 
 at 562 (¶ 26). Likewise, we find that jury instruction C-ll, though not perfect as written, contains a correct statement of the law and is supported by the evidence.
 

 ¶ 23. The record discloses that there was adequate space in the base of the white-striped triangular area for Meka to remove his vehicle completely from the lane of travel. The shoulders lining the right-hand lane leading up to and past this particular area also provided enough space for Meka to stop his vehicle without obstructing the lane of travel.
 

 ¶ 24. Throughout his argument to this Court on this issue, Meka maintains that he was in the “process” of pulling his SUV out of the lane of travel and into the “safety zone” when the Grant Plumbing truck collided with his vehicle. Meka’s factual contentions notwithstanding, evidence was presented both by Grube and Koontz, a disinterested witness, that Meka’s SUV had already come to a complete stop prior to the accident, and a portion of Meka’s SUV remained in the lane of travel. This, according to Koontz’s testimony, made it necessary for Koontz to change lanes. Grube did not see the stopped SUV until Koontz proceeded into the other lane, and he had little time to react at that point.
 

 ¶ 25. Here, in analyzing the evidence in a light most favorable to the jury’s verdict, we find that Meka partly obstructed the right-hand lane of travel in violation of section 63-3-903. His act in so doing was a proximate and contributing cause to the complained-of accident. Meka’s argument that the trial court erred by allowing the jury to apportion fault is without merit.
 

 II. Erroneous Jury Instructions Given
 

 ¶ 26. Meka argues the trial court erred by giving jury instruction C-ll, jury instruction 19, jury instruction 20, and jury instruction 21. Meka’s argument, as to each erroneous instruction, is that no evidence was presented that he did anything negligent.
 

 ¶ 27. On jury instruction C-ll, related in the previous issue, we point out that the phrase “where it was unreasonably practical,” is ambiguous. Originally, before it was modified by the trial court for reasons not disclosed by the record, the second paragraph in proposed jury instruction C-ll (then D-13) read: “If you find that the Plaintiff, Satyadev Meka, stopped his vehicle in the right lane of Interstate 55 when it was reasonably practical for him to stop his vehicle off the highway, then Satyadev Meka was negligent.” The pre-modified version accurately articulates the test reiterated in
 
 Stong.
 

 
 *26
 
 ¶ 28. Nevertheless, we are of the opinion that the language contained in the first paragraph of jury instruction C-ll, cured any faulty language used in the second paragraph. Further, as previously mentioned, the evidence illustrates that there was adequate space available for Meka to remove his vehicle completely out of the lane of travel. Thus, there was no danger of the jury going outside the limitations prescribed by
 
 Danforth
 
 in determining whether Meka violated Mississippi law.
 

 ¶ 29. Also, the record indicates that a jury instruction conference was conducted off the record before final instructions were submitted to the jury for its deliberation. The parties did not make their respective objections, which we assume were made to the trial court during the instruction conference, known for the record until after the case was submitted to the jury. On jury instruction C-ll, Meka merely entered a general objection on the grounds that the instruction as a whole was a misstatement of the law, was a misstatement of the facts in evidence, was a peremptory for the defendant, was a composite instruction that was covered by another instruction, and contained the wrong legal standard. There is no indication that Meka specifically challenged the language of the second paragraph at trial; thus, we deem any error with respect to the construction of jury instruction C-ll, to be waived. As to the other grounds asserted by Meka for the erroneousness of jury instruction C-ll, we find each without merit for the reasons discussed in the previous issue.
 

 ¶ 30. Meka also argues that jury instruction 19 was improper on the basis that no evidence was presented to establish that he was negligent. Jury instruction 19 is a general form-of-the-verdict instruction that allowed the jury to find for Grant Plumbing if they found Meka to be the sole proximate cause of the accident. Because evidence was presented that Meka was negligent, we find that jury instruction 19 was proper.
 

 ¶ 31. The same holds true for both jury instructions 20 and 21. Jury instruction 20, likewise, is a general form-of-the-verdict instruction that instructed the jury to apportion fault if Meka and Grant Plumbing both were negligent. Jury instruction 21 specifically instructed the jury to determine the percentage of fault, if any, assigned to either Meka or Grant Plumbing. Both were proper.
 

 ¶ 32. Meka also argues that the trial court erred by giving the aforementioned instructions in the order they were given, as it likely confused the jury. “How jury instructions are arranged and whether the arrangement might have been confusing is not the applicable standard set for this Court.”
 
 O’Flynn v. Owens-Corning Fiberglas,
 
 759 So.2d 526, 536 (¶ 31) (Miss.Ct.App.2000). “Rather, our job, as an appellate court, is to review the jury instructions as a whole to determine whether ‘the aggregate of the instructions, taken as a whole, fairly, though not necessarily perfectly, express the applicable primary rules of law.’ ”
 
 Id.
 
 (quoting
 
 Splain v. Hines,
 
 609 So.2d 1234, 1239 (Miss.1992)). Reading the jury instructions submitted in this case as a whole, we find that the jury was correctly guided on the law. We find no merit to this issue.
 

 III. Jury Instruction Erroneously Denied
 

 ¶ 33. Meka next asserts that the trial court erred in refusing to grant proposed jury instruction 22, which reads:
 

 You are instructed that [Grant Plumbing] did not provide any driving safety training to its employee [ (Grube) ], and did not instruct [Grube] on safe driving
 
 *27
 
 habits while operating [Grant Plumbing’s] vehicle.
 

 Therefore, if you find from preponderance of the evidence in this case that [Grant Plumbing’s] failure to not provide any safety training to its employee [ (Grube) ], or failure to not instruct [Grube] on safe driving habits while operating a [Grant Plumbing] vehicle was the sole proximate cause or proximate contributing cause of [Meka’s] injuries, then your verdict shall be for [Meka].
 

 •However, if you believe that [Meka] has failed to prove any one of these elements by a preponderance of evidence in this case, then your verdict shall be for [Grant Plumbing] as to this theory of liability.
 

 ¶ 34. Meka fails to explain to this Court how the trial court’s failure to grant this instruction affected the outcome of the trial. In
 
 O’Flynn,
 
 this Court stated that, “[t]he trial court will not be held to have erred unless the complaining party can show that the denial of the instruction probably did cause an improper judgment.”
 
 O’Flynn,
 
 759 So.2d at 531 (¶ 6).
 

 ¶ 35. Moreover, as Grant Plumbing points out on appeal, the jury found against Grant Plumbing on Meka’s respondeat superior claim. This was the most favorable result that Meka could have received against Grant Plumbing; thus, any alleged error in the trial court’s failure to grant proposed jury instruction 22 is moot.
 
 See Pickering v. Industria Masina I Traktora,
 
 740 So.2d 836, 843 (¶ 25) (“errors in jury instructions are moot where the plaintiff receives the most favorable result he could have received if the [omitted] instruction had been given”). Accordingly, we find this issue is without merit.
 

 IV. Meka’s Citizenship Status
 

 ¶ 36. Meka, who is from India and is not a United States citizen, argues that despite having been granted a motion in limine to exclude testimony and evidence regarding his citizenship status, Grant Plumbing “was allowed to question [his] Indian citizenship and to make him tell the jury that at one point his work permit status after the accident was withheld for a year.”
 

 ¶ 37. During the pretrial conference on the matter, following Meka’s request to exclude the mention of Meka’s “status as a green card holder as opposed to a natural born American,” Grant Plumbing informed the trial court that there was an issue with respect to Meka’s work-authorization status. Grant Plumbing stated that it would not bring up Meka’s citizenship status unless an issue arose about Meka’s inability to work based on Meka’s alleged injury. The trial court thereafter granted Meka’s motion in limine as to Meka’s “citizenship or the fact that he’s here on a green card.”
 

 ¶ 38. At trial, Meka testified during direct examination that he was unable to work solely because of his injury. On cross-examination, Grant Plumbing questioned Meka as follows:
 

 Q. I think the question was, Mr. Meka, that outside of saying that you were unable physically to work because of the injuries that you’re claiming in this case, there was actually at least another reason that you could not accept this job from Quality Matrix; is that correct?
 

 A. That’s correct.
 

 Q. And could you tell us what that reason was?
 

 A. At that point in time I didn’t have a work authorization.
 

 ¶ 39. We find the fact that Meka was not authorized to work in the United States relevant evidence to the issues of causation and damages. When Meka asserted at trial that he has suffered, and
 
 *28
 
 will continue to suffer, loss wages solely because of his back injury, Grant Plumbing had the right to raise the issue of Meka’s work-authorization status.
 

 ¶ 40. According to the record, the only time Meka’s nationality was highlighted was when his own attorney made the following statement to the jury during his closing argument:
 

 Now. I’ll be honest "with you. I told the [cjourt I wanted to stay away from the fact that this man’s nationality is Indian because let’s face it, some people just don’t like Indians. Some people do. Some people don’t like African-Americans. So[me] people don’t like red necks. People have prejudices. Unfortunately for the world_ we live in, we have to deal with the prejudices.
 

 ¶41. The Mississippi Supreme Court has stated that:
 

 One may not complain on review of errors for which he was responsible ... (a)n appellant will not be permitted to take advantage of errors for the commission of which he was responsible, or which he himself committed, caused, brought about, provoked, participated in, created, or helped to create, or contributed to.
 

 DeMyers v. DeMyers,
 
 742 So.2d 1157, 1160 (¶ 7) (Miss.1999) (quoting
 
 Planters Bank v. Garrott,
 
 239 Miss. 248, 264, 122 So.2d 256, 261 (1960)).
 

 ¶ 42. We find nothing in the record that suggests the jury was prejudiced against Meka because of his national origin or his lack of citizenship. This issue has no merit.
 

 ¶ 43. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 LEE, C.J., IRVING, P.J., MYERS, BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL AND RUSSELL, JJ., CONCUR.
 

 [1]
 

 . The cause of Meka's discomfort was not developed at trial.
 

 [2]
 

 . According to the record, the speed limit at this particular section of 1-55 is sixty miles per hour.
 

 [3]
 

 . According to the record, the impact with the UtiliQuest truck resulted in a broken tail light and a small dent to the UtiliQuest truck’s rear bumper.